DALY v. WALRATH et al.

(Supreme Court, Appellate Division, Second Department.  May 8, 1899.)

1. COPYRIGHTS—DRAMAS—PUBLICATION—CONTRACT.
Where the composer sells all rights of a drama in a foreign state, and afterwards authorizes its publication at home, the buyer, not having taken out copyright in the foreign state, cannot enjoin its use there by one obtaining his version from the authorized publication, notwithstanding the author violated his contract with the buyer when he authorized the publications.

2. SAME—EVIDENCE.
To prove that a composer authorized the publication of a drama, one of the publishers testified that for each edition the author got a fixed fee that always reached him by an order to his banker, and that receipts were always sent in return; and another corroborated him, and testified the publication was with the author's consent.  _Held_, that the evidence established the fact.

Appeal from special term, New York county.

Suit by Augustin Daly against Lillian Walrath and others. There was a decree for defendants, and complainant appeals. Transferred from First to Second department.  Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

A. J. Dittenhoefer (David Gerber, on brief), for appellant.
Charles Henry Butler, for respondents.

WILLARD BARTLETT, J.  Some time prior to December 16, 1889, Herman Sudermann, of Berlin, a German author of distinction, wrote a play entitled "Die Ehre," or, in English, "Honor." Upon that date he entered into a contract with Emanuel Lederer, of New York, whereby he sold to the latter the play aforesaid, with the original manuscripts in the German and English languages, for the United States of America, England, Canada, and Australia; it being declared to be the intent of the agreement that the said Emanuel Lederer should be, in the above territory, "the sole and exclusive owner of the said stage work aforesaid." In this contract Herman Sudermann obligated himself to keep the work in manuscript form, and not to allow the same to appear in the book trade, in order that it might be protected under the laws of the United States.  By a contract made on February 14, 1890, Emanuel Lederer sold to the plaintiff, who is a well-known theatrical manager in New York, the exclusive right thereafter to produce and perform "Die Ehre" in English, in the United States, Canada, and Australia.  To this agreement was attached a paper, signed by the author, under date of August 7, 1890, at Berlin, confirming the sale by Emanuel Lederer to Augustin Daly, evidenced by the preceding instrument.  The play in question has never been copyrighted in this country.  In 1891 the defendant Francis Reinau purchased, at a book store in the city of New York, a printed copy of it in the German language, in a book which purported to be the fourth edition of the work, published by F. & P. Lehmann at Berlin. From this he made a translation of the drama into English, and the resulting version has been produced upon the stage in this

country by the defendants, without asking or obtaining the consent ·of Messrs. Sudermann, Lederer, and Daly, or any of them. It appears that later German editions were offered for sale and sold · at book stores in New York and Chicago, published by the house of J. G. Cotta of Stuttgart, which succeeded F. & P. Lehmann in business; and that as many as 16 editions had been published at the time of the trial. The trial court has found that the publication of the work in Germany was the result of a contract between the publishers and the author, and the defense rests upon the proposition that, inasmuch as the drama has been published and sold with the authority and by the consent of the person who wrote it, all exclusive literary property therein has ceased, so far as this country is concerned, and any one here now has a legal right to produce it, either in its literary form or on the stage, in German or English. The rule relied upon by the respondents is thus stated by Mr. Drone in his well-known treatise on the Law of Copyright:

"When a dramatic composition is published in print by authority, all common-law rights in it are lost. The composition becomes common property unless a valid copyright is secured under the statute. And this is equally true whether the publication be made in one country or in another; whether in the United States or in Europe." Drone, Copyr. 577.

"It is a proposition now so well settled as to be almost axiomatic," said the circuit court of the United States in the Maryland district in the Iolanthe Case, 15 Fed. 439, "that, except so far as preserved to him by statute, when the composer of any work, literary, musical, or dramatic, has authorized its publication in print, his control over so much as he has so published, and of the use which others may make of it, is at an end."

Under this doctrine the publication by the author of the text of a drama in a printed book destroys his playright, or right to control the representation of the drama on the stage. Drone, Copyr. 583; The Mikado Case, 25 Fed. 183. After Sudermann, therefore, had transferred to Lederer, and Lederer had transferred to the plaintiff, the exclusive right to produce and perform "Die Ehre" in English in the United States, the plaintiff had acquired the author's common-law right of representing the play in this country; but that right became the property of any one who chose to exercise it when the original play was subsequently published and sold in book form with Sudermann's authority, if it was in fact so published and sold. To justify their production of the play, then, it was essential for the defendants to show that Sudermann consented to the publication by the houses of Lehmann and Cotta, for it has been held that the consent of the author in such a case must be affirmatively proved by the party who relies upon it. Boucicault v. Wood, 2 Biss. 34, Fed. Cas. No. 1,693. I think that the defendants sustained their burden in this respect. The purchase of various editions of the book in New York and Chicago was proved by the defendant Reinau, but the circumstances concerning the relations between the author and the publishers had to be sought by means of a commission to examine witnesses in Germany. The testimony of Alfred Kroner and Johann Wilhelm Spemann was taken in this way. Both gentlemen had been members of the Lehmann publishing firm at Berlin, and were members

of the Cotta publishing firm at Stuttgart. Mr. Kroner testified that the book containing "Die Ehre" was first printed, sold, and offered to the public by F. & P. Lehmann in the year 1890. He prefaced this statement by the words, "As far as I know," and counsel for the plaintiff therefore objected to the evidence, and moved to strike it out as hearsay. This motion was properly denied. The qualifying clause merely indicates, I think, that the witness did not know of any earlier publication of the book than that which he mentioned. He then stated that J. G. Cotta, of Stuttgart, became the publisher of the book, he believed, in 1891, and that 16 editions had been published and offered for sale, each edition consisting of 1,000 volumes. He testified that the written contract under which the publication was made was in the possession of the firm of Cotta, and therefore in his own control, but declared that he was unable to furnish a copy of the contract without Mr. Sudermann's consent, nor could he state the contents without such consent; but he added that each time a new edition had been published Mr. Sudermann had received a fee from the publishers, the amount of which, however, the witness would not disclose. A motion was made to strike out this testimony concerning the fee. The court denied it, and the plaintiff excepted. I think it was properly allowed to remain in the case. On the present appeal it is argued that this evidence does not suffice to show any payment to Sudermann, because upon the cross-interrogatories it appeared that the knowledge of the witness on the subject was based merely upon the fact that he had ordered the payments for the last editions. Mr. Kroner, however, answered further: "For each edition Mr. Sudermann gets a fixed fee that always reaches him by an order to his banker at Berlin. Receipts by Mr. Sudermann are always sent in return, but without Mr. Sudermann's consent I cannot produce them, or copies of them." This testimony is characterized as incompetent because it merely states a conclusion. Doubtless it is objectionable so far as it indicates the contents of the receipts mentioned, but I see no ground for rejecting the first part of the answer, to the effect that the author got a fee for each edition, sent to his banker at Berlin. The testimony of Mr. Kroner was corroborated by that of Mr. Spemann, the other witness examined under the commission; and, even if some of the objections to the evidence given by Mr. Kroner are entitled to greater weight than I have given to them, it seems to me that the fact that Mr. Sudermann authorized the publication of the book from which the defendants obtained the play in question is sufficiently established by Mr. Spemann's answer to the thirteenth interrogatory. There was no objection in behalf of the plaintiff to the interrogatory, nor was there any motion to strike out the answer. I quote from the appeal book:

"Thirteenth. 'Were the publications of said composition made by F. & P. Lehmann and by the publishing house of J. G. Cotta made without or with the authority and consent and approval of the author or his agents?' To the thirteenth interrogatory he deposes: 'Quite sure,—with the consent of the author.' "

This evidence makes it plain that Sudermann has violated his contract with Lederer not to publish the play. The breach of his covenant with Lederer, however, does not confer upon Lederer, or upon the plaintiff, as Lederer's assignee, any right to enjoin the defendants from producing the play which Sudermann has seen fit to make common property by publishing it in disregard of his agreement. As Mr. Justice Barrett observed in his opinion upon dissolving the preliminary injunction herein:

"If an author could thus grant licenses for all the world except his own country, and then publish in his own country without such publication affecting the rights of his licensees, there would be but little need of an international copyright law."

In the last point upon their brief the learned counsel for the appellant suggest the proposition that the right of the owner of a dramatic composition to produce it upon the stage is distinct from his right to multiply copies, and that the right of stage representation is not lost or surrendered when the author exercises his right to publish the play. They concede, however, that the case of Jewelers' Mercantile Agency v. Jewelers' Wkly. Pub. Co., 155 N. Y. 244, 49 N. E. 872, may be considered so far an authority against them on this point that they do not care to elaborate their views on the subject. I think that the decision at special term was correct, and should be affirmed.

Judgment affirmed, with costs. All concur.