## MAX J. KORTLANDER, Plaintiff, *v.* PERRY BRADFORD and Others, Defendants.

(Supreme Court, Westchester Special Term, October, 1921.)

**Copyright — sale of production by author — rights of purchaser — — action by purchaser to restrain publication sustained.**

> An author, after he has sold his entire right, title and interest in his literary creation, may not copyright it and grant licenses to others to print, publish and produce it.
>
> A complaint alleged that one of the defendants wrote a musical composition entitled " Wicked Blues " which for value he sold to plaintiff; that with knowledge of plaintiff's right and without his consent said defendant and another of the defendants copyrighted and published the song under the name of " Crazy Blues; " that the corporation defendant claims an interest in and is publishing the song with knowledge of plaintiff's rights; that the other defendants are manufacturing, publishing and selling mechanical contrivances reproducing said song under a license from their co-defendants, without plaintiff's consent, and without compensation or royalty to him; that certain of the defendants have received from the other defendants large royalties from the publication, sale and reproduction of said song, and threaten to continue the violation of plaintiff's rights. In an action to restrain the publication and sale of " Crazy Blues " and for an accounting of profits, *held,* that the complaint stated a good cause of action against all of the defendants, to enforce the plaintiff's common law rights, and that the action was within the jurisdiction of the state courts.
>
> The plaintiff, as against the author of the musical composition and all the world, had acquired an equitable right to the first printing and publication of the song and such right was within the cognizance of a court of equity.
>
> *Palmer* v. *DeWitt,* 47 N. Y. 532, followed.

DEMURRER interposed to complaint in action for an injunction.

I. L. Broadwin, for plaintiff.

Schechter & Lotsch, for defendants Bradford and others.

Augustus T. Gurlitz, for Victor Talking Machine Co.

YOUNG, J.  This action is brought to restrain the publication and sale by defendants of a song entitled " Crazy Blues " and for an accounting of the profits and income derived therefrom.

The complaint alleges in substance that the defendant Perry Bradford wrote a musical composition entitled " Wicked Blues;" that for value he sold all his rights therein to plaintiff; that he and defendant Dickerson, with knowledge of plaintiff's rights and without his consent copyrighted and published the song under the name of " Crazy Blues," and that the defendant Perry Bradford, Inc., claims an interest and is publishing the same with knowledge of plaintiff's rights; that the other defendants are manufacturing, publishing and selling mechanical contrivances reproducing the said song under a license from the defendants Bradford, Dickerson and Perry Bradford, Inc., without plaintiff's consent and without compensation or royalty to him; that defendants Bradford, Dickerson and Perry Bradford, Inc., have received from the defendants large royalties from the publication, sale and reproduction of said song, and the defendants threaten to continue the violation of plaintiff's rights.

Demurrers have been interposed by the several defendants, which are substantially alike, and are:

(1) That the court has no jurisdiction of the subject matter.

(2) That causes of action have been improperly united.

(3) That the complaint does not state facts sufficient to constitute a cause of action.

The first ground of demurrer is plainly untenable. The action seeks to enforce plaintiff's common-law rights and is not brought under the United States Copyright Statutes. This court, therefore, has jurisdiction.

As to the second ground of demurrer, I think the complaint states a single cause of action to restrain the further violation of plaintiff's rights in the song in question to recover damages and to compel an accounting. In other words, the subject matter is plaintiff's property rights in the song and all the facts alleged relate to that subject matter. *Burns* v. *Niagara, etc., Co.,* 145 App. Div. 280.

I also think that the complaint states a good cause of action against the defendants Bradford, Dickerson and Perry Bradford, Inc. Another question to be determined is whether any cause of action exists under the facts alleged against the remaining defendants.

The rights of authors in their unpublished works are well settled. The author of a literary work or composition has at common law a right to its first publication; he may determine whether it shall be published at all, and if published, when, where and by whom and in what form. This exclusive right is confined to the first publication. When once published it is dedicated to the public, and the author has not at common law any exclusive right to multiply copies of it or to control the subsequent issue of copies by others. *Palmer* v. *DeWitt,* 47 N. Y. 532.

In the *Palmer* case the court said: "An author or proprietor of an unpublished literary work has then a property in such work, recognized and protected both here and in England, and the use and enjoyment of it is secured to him as of right. This property in a

manuscript is not distinguishable from any other personal property. It is governed by the same rules of transfer and succession, and is protected by the same process, and has the benefit of all the remedies accorded to other property so far as applicable. * * *

"In declaring the rules of law and applying legal remedies for the redress or prevention of wrong, there is no distinction between the right of the banker to his bills and bonds embezzled and found here in the possession of a wrong-doer, and the right of an author to his manuscript clandestinely or surreptitiously taken and brought here for publication, to his prejudice and the destruction of all its value as property. Both resort to the courts for the protection of acknowledged rights of property, and are entitled to the remedies given by law.

"Until published, the work is the private property of the author, wherever the common-law rights of authors are regarded. When once published, with the assent of the author, it becomes the property of the world, subject only to such rights as the author may have secured under copyright laws, and they can have no force or give any rights beyond the territorial limits of the government by which they are enacted. The rights of assignees domiciled here, of alien authors resident abroad, have been sustained by the courts of this country, and no distinction has been made between transfers of literary property and property of any other description. * * *

"The assignability of a copyright before publication is not questioned. The right of sale and transfer is one of the inseparable incidents of property, and the property in a manuscript may be transferred, and upon the death of the owner goes to the personal representatives or next of kin of the owner, as other personal property. A literary man realizes the product

of his labor either by the sale of his manuscript or the publication and sale of his works."

In the *Palmer* case it appeared that one Robertson composed a drama called "Play," and that he sold and assigned to plaintiff the exclusive right and privilege of printing and acting, etc., in the United States, the said drama. On February 16, 1868, and many times thereafter the drama was publicly performed and represented at the Prince of Wales Theatre in the city of London with the author's sanction in the presence of large audiences, with no notice or prohibition against carrying the same away and making such use of the same as any of the audience saw fit. On March 25, 1868, the defendant, a resident of New York city, and a citizen of the United States, printed and sold copies of the drama in New York, having received it from parties or persons who had seen and heard it represented and performed in London, and the action was brought by plaintiff to restrain the defendant from printing and selling the drama and for an account, etc. The court held that the bringing out and representation upon the stage of a dramatic composition is not such a dedication of it to the public as will authorize others to print and publish it without the author's permission.

The court in the *Palmer* case further said: " The plaintiff has, for a valuable consideration, acquired the right to the first publication of this drama, as well as the right to represent the same upon the stage in the United States, and it is a right of pecuniary value. It is true it may be lost by publication here or elsewhere. (*Jefferys* v. *Boosey*.) But the plaintiff, under his transfer, might restrain the author, as well as every other person, from publishing the work within the United States to his prejudice. As against the author and all the world, the plaintiff has acquired, by the

payment of a valuable consideration, an equitable right to the first printing and publishing of the drama here, and the right is within the cognizance of a court of equity."

In *Ferris* v. *Frohman,* 223 U. S. 424, it was held that the exclusive common-law performing rights of the owners of an unprinted and unpublished play are not lost by the public presentation, and Mr. Justice Hughes in the concluding paragraph of his opinion used this language: " Our conclusion is that the complainants were the owners of the original play and exclusively entitled to produce it. Their common-law right with respect to its representation in this country had not been lost. This being so, the play of the plaintiff in error, which was substantially identical with that of the complainants, was simply a piratical composition. It was not the purpose or effect of the copyright law to render secure the fruits of piracy, and the plaintiff in error is not entitled to the protection of the statute. It other words the claim of Federal right upon which he relies is without merit."

In *Goldmark* v. *Kreling,* 35 Fed. Repr. 661, plaintiffs had purchased the exclusive right to use in America the operetta " Nanon." It appeared that the piano score had been published in Europe, but it did not appear very clearly, if at all, that it was with the author's consent. But the court, in its opinion, did not deem this important, since it clearly appeared that neither the score nor any part of the operetta was published with plaintiff's consent, either in Europe or America. Sawyer, J., said: " The authors, certainly, could not have sold, and conveyed, any right to a third party to perform their operetta in America, so as to cut off the prior exclusive right conveyed to Goldmark and Conried. If they could not cut them off by subsequent sale, we do not perceive how they could do it by

a subsequent dedication to the public by publication. In our judgment, defendants had no right to use the piano score, even if it had been published by the authors in Europe after the right of complainants had attached. We are not certain, that it was published with the consent of the authors. * * * But concede it to be so, there was no consent of complainants, in whom the exclusive right for America had already vested.''

In *Daly* v. *Walrath,* 40 App. Div. 220, decided by the Appellate Division of the second department in 1899, it appeared that one Sudermann of Berlin wrote a play. On December 16, 1889, he entered into a contract with Emanuel Lederer of New York whereby he sold to the latter the play aforesaid, with the original manuscripts in the German and English languages, for the United States of America, England, Canada and Australia, it being declared to be the intent that he, Lederer, should be in that territory the sole and exclusive owner of said stage work, and in this contract Sudermann obligated himself to keep the work in manuscript form, and not to allow the same to appear in the book trade, in order that it might be protected under the laws of the United States. On February 14, 1890, Lederer sold to plaintiff the exclusive right to produce and perform this play in English in the United States, Canada and Australia. To that agreement was attached a paper signed by the author, dated August 7, 1890, at Berlin, confirming the sale by Lederer to plaintiff. The play in question was never copyrighted in this country. In 1891 the defendant Reinau purchased, at a book store in the city of New York, a printed copy of it in the German language, which purported to be the fourth edition of the work published by a firm in Berlin. From this he made a translation into English, and the resulting version was

produced upon the stage in this country by the defendants without obtaining the consent of Sudermann, Lederer, Daly or any of them. It also appeared that later German editions were offered for sale and sold at book stores in New York and Chicago, published by a firm in Stuttgart, and that as many as sixteen editions had been published at the time of the trial. The trial court found that the publication of the work in German was the result of a contract between the publishers and author, and it was held that in case of such a breach, by the author, of the contract not to publish the play, the vendee was not entitled to enjoin a stranger to the contract from producing it upon the stage in the United States; the court saying: "After Sudermann, therefore, had transferred to Lederer, and Lederer had transferred to the plaintiff, the exclusive right to produce and perform *Die Ehre* in English in the United States, the plaintiff had acquired the author's common-law right of representing the play in this country; but the right became the property of any one who chose to exercise it, when the original play was subsequently published and sold in book form with Sudermann's authority, if it was in fact so published and sold."

None of the cases above cited involved the precise question presented in the case at bar, viz., whether an author may sell his entire right, title and interest in his literary creation and subsequently copyright it and grant valid licenses to others to print, publish and produce it.

The *Palmer* and *Frohman* cases simply determined that representation of a drama on the stage is not a dedication to the public.

The *Goldmark* case held that publication with the author's consent could not defeat the exclusive rights in America theretofore conveyed to purchasers, and

the *Daly* case on the contrary decided that publication with the author's assent, in violation of his agreement with one to whom he had sold the play for use in certain territory, is a dedication to the public and that the vendee's assignee could not maintain an action against a stranger to the contract to restrain production.

It will be noted, however, that neither in the *Goldmark* nor in the *Daly* cases had the author parted with his entire interest in the production, but only rights in certain territory, reserving to himself all rights elsewhere, subject in the *Daly* case to the author's agreement not to publish. The effect of the latter decision in my opinion is that a breach of this personal covenant by the author did not create a cause of action in favor of the plaintiff against a stranger to the contract who innocently took advantage of the author's publication. In any event, it seems to me plain that in the *Daly* case there remained with the author a right with which he had the power to deal. Here there remained with the defendant Bradford not a vestige of right, title or interest. Having, therefore, nothing with which to deal, he could neither license nor convey, nor could the defendants obtain any rights in the song.

I think the rule laid down in the *Palmer* case applies to the case at bar, and that the plaintiff has acquired as against the author and all the world an equitable right to the first printing and publishing of the song, and that that right is within the cognizance of a court of equity.

The demurrers are overruled with leave to the defendants to answer within twenty days on payment of costs.

Demurrers overruled.